421 So.2d 984 (1982)
William R. LeBLANC, Plaintiff-Appellee,
v.
OPT, INC., et al., Defendants-Appellants.
No. 82-196.
Court of Appeal of Louisiana, Third Circuit.
October 13, 1982.
Rehearing Denied December 2, 1982.
Provosty, Sadler & deLaunay, Frederick B. Alexius, Alexandria, for defendants-appellants.
William E. Skye, Alexandria, for plaintiff-appellee.
Before DOMENGEAUX, DOUCET and YELVERTON, JJ.
YELVERTON, Judge.
From a judgment awarding William R. LeBlanc, a real estate developer, $132,950 based on quantum meruit, the defendants Opt, Inc. and Richard Friedberg appeal. *985 Richard Friedberg additionally appeals the trial court decision that the corporate defendant was his alter ego and that he is individually liable. Plaintiff answered the appeal seeking an increase in the award.
In 1975 Opt, Inc., a Louisiana Corporation, acquired an 86 acre tract of unimproved land on McArthur Drive in Alexandria, Louisiana. The purchase price was $892,500. The ultimate purpose of the acquisition was the development and sale of the property for both commercial and residential uses. Opt, Inc. was wholly owned by Richard Friedberg, an investor and real estate developer.
In March, 1977, William J. LeBlanc, a real estate broker and developer in Alexandria, met with Friedberg in Baton Rouge at the corporate office of Opt, Inc. The two were brought together by mutual friends. The purpose of the meeting was the development of the 86 acres, known as North Village. At this meeting they discussed general plans for the development. A second meeting in early April was held to discuss the development in more detail. At the April meeting LeBlanc was employed by Opt to prepare the plans and develop and sell the property.
LeBlanc went to work immediately. He was given an office, a secretary, and an expense account. He was also paid $2,500 a month. Five months later this was reduced to $1,750. In January 1980 he was terminated.
LeBlanc worked full time for Opt during the 34 months of his employment, from April 1977 to January 1980. During this time he was paid a total of $45,050. After he was terminated he brought this suit seeking damages of $311,370 based on contract. In the alternative, he asked for an award of $281,670 based on quantum meruit. The defendants denied any indebtedness, basically contending that LeBlanc was simply a salaried employee working by the month.
The trial court concluded that contract damages were not recoverable because no contract was proved. No written contract was ever signed. Although two written instruments were signed by LeBlanc and tendered to Friedberg, the latter refused to sign them. The trial judge also concluded that no verbal contract was proved because the evidence did not preponderate in favor of either party's version of their arrangement. The court accordingly held that the will of both parties did not unite on the same point, there was no consent given to any particular agreement, and therefore no contract existed between them.
Based on our review of the record, we agree with the trial court as to these factual conclusions.
The basic contention on appeal is whether plaintiff is entitled to recover in quantum meruit. The defendants-appellants resist any recovery at all, insisting that LeBlanc was employed by the month on a salary, and that he could quit any time and they could fire him at any time. Defendants agreed that there had been some discussion concerning LeBlanc's exclusive listing rights and his potential entitlement to realtor's fees. The parties sharply disagreed, however, as to the details, but there was enough evidence of realtor fees being contemplated by the parties for the trial court to be convinced that something considerably more than a mere month-to-month salary was envisioned, and we are also convinced that this is so. The trial judge noted that LeBlanc's total salary ($45,050) for his three years of employment was "an incredibly low figure for the services he rendered, in light of his prior real estate developments and expertise therein".
It is at this point that quantum meruit becomes the operative doctrine. Quantum meruit is an equitable doctrine, based on the concept that no one who benefits by the labor and material of another should be unjustly enriched thereby. Under those circumstances the law implies a promise to pay a reasonable amount for the labor and material furnished, even in the absence of a specific contract therefor. Gauguin, Incorporated v. Spring, 316 So.2d 858 (La.App. 3 Cir.1975).
*986 In determining that LeBlanc was entitled to recover in quantum meruit, the trial judge found that the actual value of LeBlanc's services far outweighed what he was actually paid. The trial court also found that the defendants had been enriched by much more than the amount Le-Blanc was actually paid.
The record thoroughly supports these conclusions. When plaintiff began work in 1977, the property was a tract of raw, unimproved land. He furnished the defendants with a concrete plan to develop the entire tract for commercial use, and single-family residential and multi-family residential use. The whole tract has been subdivided. All the work was done that was required to have the project approved by the City of Alexandria. LeBlanc encountered considerable difficulty, including public opposition regarding zoning requirements, but succeeded in getting the property properly zoned for the development to proceed. All of the engineering and construction has been completed relative to the drainage, water, sewer, gas, and electrical facilities. The main commercial street, North Boulevard, as well as Lacassine Drive and the first stretch of Tunica Drive have been designed and constructed. The largest single contract which LeBlanc let and supervised in the development was over $500,000.
LeBlanc performed additional work beyond that which was contemplated by the development of the tract. He obtained Days Inn motel franchises for Opt in the four cities of Alexandria, Lafayette, Houma and Monroe. A completed package for a Days Inn construction on North Village was prepared. LeBlanc handled a $199,000 land purchase in Lafayette for a Days Inn construction site. The benefits this work provided defendants were summed up by the trial judge as follows:
"Opt, Inc. now owns a valuable piece of developed land. If they wished to begin constructing houses, apartments, or businesses on the tract tomorrow, they could. This would not be possible without plaintiff's efforts. Further, LeBlanc gave Opt, Inc. a completed package for the construction of the Days Inn on the tract. If the money becomes available, construction could begin immediately."
The trial court awarded LeBlanc $178,000 as the amount he deserved for his efforts in developing North Village from raw land to an established commercial and residential subdivision, together with his efforts on the various motel projects at Richard Friedberg's request. From this total the trial court deducted the $45,050 previously paid LeBlanc on a monthly basis, leaving a net judgment amount of $132,950. This amount was obviously based on the testimony of Hab Monsur of Alexandria, an expert in real estate and development, who was the only expert to testify in the case. Mr. Monsur was present throughout the trial, reviewing all of the exhibits, and was personally acquainted with the before and after condition of North Village. Our review of the record causes us to agree with the trial court that the amount awarded was reasonable and equitable and should be neither decreased nor increased.
The other major issue on appeal was whether Richard Friedberg should be held personally liable. The trial court concluded that he should, on the theory that Opt, Inc, was merely the alter ego of Friedberg.
The trial court found the following facts to pierce the corporate veil:
"Defendants' exhibits D-18, D-19, and D-20 show that Cinema Shares International, Inc. was the record owner of 5,000 shares in Opt, Inc. on December 5, 1975. On January 1, 1976, these shares were transferred to Omni Capitol Worldwide, Ltd.; then, on August 1, 1979, these shares were transferred to Richard Friedberg.
"However, the evidence clearly shows that Cinema Shares International, Inc. and Opt, Inc. were both subsidiaries of Omni Capitol Worldwide, Ltd. In fact, Omni Capitol was the parent company for at least fifteen Louisiana corporations. Friedberg testified that he controlled all of these corporations. Further, Friedberg owned eighty percent of Omni Capitol *987 Worldwide, Ltd. at all relevant times. (See P-2, page 10.) Although Friedberg did not personally own stock in Opt, Inc., he was, in fact, the owner.
"Further, it is clear that Friedberg tended to use these corporations in his business projects, and to mix their affairs. North Village was actually to be developed by two corporations: Opt, Inc. owned the land, but North Village Development Company was to develop it. Also, Friedberg admitted that he transferred funds freely between all of his companies. David Purcell testified that this was done on a daily basis. Richard Friedberg said that it was done two or three times a week. He testified that he could pick up the phone and tell the bank to transfer a couple of hundred thousand dollars from the account of one corporation to another corporation, and that he had done so on numerous occasions (P-2, pages 68, 69). He also said that he had blanket authority in the minutes of each corporation to make these loans, and that the loans were ratified at a board of directors meeting of each corporation each year.
"The evidence also shows that many corporate formalities were not observed. Although the defendants introduced forty documents dealing with the corporate operations of Opt, Inc., only one of them represented the minutes of a shareholders meeting, and that one was held in 1974 (D4). Further, the exhibits show seventeen board of directors meetings. Of these, thirteen are special meetings. None of them is denominated an annual meeting, and all of them deal with one topic aloneauthorizing a person to buy, sell, or deal in real estate. These minutes do not reflect any other function of the board of directors. Friedberg admitted that the only minutes that were ever kept dealt with this subject alone, and were drawn up solely to provide the necessary authority to allow individuals to deal in real estate for the corporation (P-2, page 66).
"This Court also notes that at the first shareholders meeting (D-5) Richard Friedberg was elected secretary-treasurer of the corporation. Yet, at a board of directors meeting held the next month W.L. Ryder, who had been elected vice president, signed the minutes as secretary. Reviewing the minutes of the rest of the board meetings, five different people sign as either a secretary or vice president. There is no indication of when these officers were elected by the board of directors as required by the Louisiana Business Corporation Act. LSA R.S. 12:82. This matches David Purcell's testimony that Friedberg often told him to sign documents as an officer of the corporation but that he was never elected to any office.
"Finally, it is clear to this Court that Friedberg dominated the affairs of the corporation. Plaintiff testified that Friedberg approved the use of a contract negotiation rather than bids on the street and drainage contract, approved the contract to install street lights, approved the idea and plans to use prefabricated houses, agreed to build twenty-five of them, agreed to at least one of the commercial development ideas and was constantly kept appraised of all new developments. Friedberg disputed some of this testimony; however, it is apparent that he was in almost constant contact with Mr. Le-Blanc. For example, an examination of Mr. LeBlanc's telephone records (P-19) shows at least one phone call between LeBlanc and Friedberg on virtually every page. Friedberg admitted these calls, and approving all the expenditures (P-2, page 32). In his deposition, Friedberg testified that LeBlanc was to present plans for the project, which he, as owner, had the right to veto or approve (P-2, page 24). He also admitted that LeBlanc was furnished an office at his direction, that LeBlanc's draw was reduced and then cut off at his direction and then he or someone at his direction fired LeBlanc (P-2, pages 46, 47, and 63). In fact, Friedberg testified that there was to be no written contract with plaintiff because he wanted to reserve the right to dismiss him at will (P-2, page 69).

*988 "There are other indications scattered throughout plaintiff's exhibits that third parties understood that the decision to continue or discontinue the projects rested solely with Friedberg. This Court is satisfied that he disregarded corporate formalities and entities, and so dominated the operations of Opt, Inc. that the corporation was, in fact, his alter ego. Therefore, LeBlanc should be allowed to recover a personal judgment against him."
The legal principles concerning this issue were stated in Kingsman Enterprises, Inc. v. Bakerfield Electric Company, Inc., 339 So.2d 1280 (La.App. 1 Cir.1976) as follows:
"The general rule that corporations are distinct legal entities, separate and distinct from the individuals who compose them, is statutory in origin and well recognized in the Louisiana jurisprudence. La.C.C. art. 435; Buckeye Cotton Oil Company v. Amrhein, 168 La. 139, 121 So. 602 (1929); Texas Industries, Inc. v. Dupuy Johnson v. Kinchen, 160 So.2d 296 (La. App. 1st Cir.1964). Thus, shareholders are not individually responsible for the debts due by the corporation. La.C.C. art. 437; La.R.S. 12:93(B); Texas Industries, Inc. v. Dupuy & Dupuy Developers, Inc., supra.

"There are, however, limited exceptions to the rule of non-liability of shareholders for the debts of a corporation whereby the court may ignore the corporate fiction and hold the individual member or members liable. In such situations courts commonly refer to the corporation as the `alter ego' of the shareholder. One such exception to the non-liability rule involves situations where fraud or deceit has been practiced on a third party by the shareholder acting through the corporation. La.R.S. 12:95; Bossier Millwork & Supply Company v. D. & R. Construction Company, Inc., supra.

"Another basis for disregarding the corporation entity involves the failure to conduct a business on corporate footing, thereby disregarding the corporate entity to such an extent that the corporation ceases to be distinguishable from its shareholders. Gordon v. Baton Rouge Stores Company, 168 La. 248, 121 So. 759 (1929); Brown v. Benton Creosoting Company, 147 So.2d 89 (La.App. 2d Cir. 1962). In Louisiana, courts usually base this rule upon the often-quoted language of Keller v. Hass, supra:

`It is well settled that where an individual forms a corporation of which he is the sole and only stockholder or owns such control of the stock that the act of the corporation is his own, then he may not use the screen of corporate entity to absolve himself from responsibility. [Citations omitted]' 12 So.2d at 240
"However, the broad language quoted gives little indication as to what circumstances justify piercing a corporate veil absent fraud on the part of the shareholder. (footnote omitted) In fact, courts in cases involving issues of shareholder liability often fail to clearly enunciate the bases for disregarding corporateness under which they seek to hold the shareholder liable. This confusion of the grounds for disregarding corporate identity may occur because circumstances exist which support piercing the corporate veil because of both fraud and the failure to operate the corporation on a corporate footing distinct from the shareholder's personal identity. Also, the failure of a shareholder to adequately separate the corporation's identity from his own because of various factors may lead to fraud or deceit. Regardless of the basis for piercing the corporate veil, it is clear that the situation must be viewed with regard to the totality of circumstances in each case. However, it should be kept in mind that in Louisiana the concept of the separation of the corporate entity from its shareholders is the general rule and is firmly established. Because of the beneficial role of the corporate concept, this principle should be disregarded in only exceptional circumstances. Johnson v. Kinchen, supra."

That court also listed the factors which would justify piercing a corporate veil absent fraud on the part of the shareholder. *989 These factors were: co-mingling of corporate and shareholder funds; failure to follow statutory formalities for incorporation and the transaction of corporate affairs; failure to provide separate bank accounts and records; and failure to hold regular shareholders' or director's meetings.
Whether the doctrine is to be imposed is primarily a factual finding best made by the trial court. Smith-Hearron v. Frazier, Inc., 352 So.2d 263 (La.App. 2 Cir. 1977), writ denied 353 So.2d 1337 (La.1978).
In the present case the trial court found that Friedberg failed to conduct Opt, Inc. on a corporation footing to the extent that the corporation ceased to be separate from Friedberg. The record clearly established that Friedberg had control of Opt, Inc., that he failed to hold regular shareholder and director's meetings, that he failed to follow statutory formalities in the transaction of corporate affairs, and that he freely co-mingled funds from one corporation to the other.
The evidence also reveals that the decision to employ LeBlanc to be project manager, the decision to give the plaintiff a commission, the decision to discontinue the projects and the decision to release the plaintiff from his employment without just compensation rested solely with Friedberg. For three years the plaintiff attempted to secure a written contract of employment with Friedberg and Opt, Inc. For three years plaintiff worked under the representation that he would eventually be able to secure commissions on the sale of the property. Friedberg freely admitted that he made these representations to the plaintiff. After the plaintiff worked in readying the property for commercial sales, Friedberg decided to discontinue the project as well as plaintiff's employment without proper compensation for his services. Such representations and dealings, such as here, almost amount to an attempt to defraud.
Under these circumstances in order to prevent such an injustice we find that the trial court properly disregarded the corporate veil and held Friedberg personally liable.
There are two remaining issues on appeal which we now address. One is the contention of plaintiff that the trial court erred in awarding interest from the date of judgment instead of from the date of judicial demand. The trial court was correct. The law is well established that interest on an award based on quantum meruit is allowed only from the date of final judgment. Succession of Butler, 294 So.2d 512 (La. 1974); and Smith v. McMichael, 381 So.2d 898 (La.App. 2 Cir.1980).
The remaining issue is whether the trial court erred in assessing to plaintiff one-half of the costs of the trial proceedings. We are inclined based on our appreciation of the facts to agree that this was error. Although under LSA-C.C.P. Art. 1920, the trial court has broad discretion in the assessment of costs, this discretion is not unbounded. Gonzales v. Southwest Mobile Homes, Inc., 309 So.2d 780 (La.App. 3 Cir.1975); writ denied, 313 So.2d 239 (La. 1975); and Slater v. Slater, 410 So.2d 1197 (La.App. 3 Cir.1982). In the absence of some equitable or other good reason, costs generally follow the final judgment in favor of the prevailing party. Greenburg v. Fourroux, 300 So.2d 641 (La.App. 3 Cir. 1974), writ denied 303 So.2d 181 (La.1974).
The reason given by the trial court for dividing costs was that the present litigation could have been avoided if the "parties had not run their affairs on such a loose basis". We cannot agree that this was a factually sound basis for splitting costs. Plaintiff repeatedly attempted to secure a written contract from Friedberg which would have formalized the obligations of each party. These efforts were unsuccessful. Not until trial did it become apparent why the proffered contracts were not even considered. Friedberg testified it was never his intention to sign an employment contract because this was against his business practice. Under these circumstances it was clearly wrong to cast plaintiff with part of the costs.
*990 For the reasons assigned, the judgment of the trial court is affirmed, except that the judgment assessing half the costs to the plaintiff is reversed and all costs, both at trial and on appeal, are hereby assessed to the defendants.
AFFIRMED in part, REVERSED in part, and RENDERED.